## METZLER *against* KILGORE.

In regard to the entry of judgment, and their priority of lien, a day is not susceptable of juridical division. In the appropriation, therefore, of the proceeds of land sold by the sheriff, judgments entered upon the same day, when the fund is insufficient to discharge them all, are to be paid *pro rata;* although it may appear, that one was entered at an hour of the day earlier than the others.

APPEAL from the decree of the Court of Common Pleas of *Cumberland* county, appropriating the proceeds of the sale by the sheriff, of the real estate of *Jesse Kilgore.*

*Kilgore* gave an amicable judgment to *Thomas Metzler,* one to *Henry Leppert* and one to *Abraham Higernell;* all of which were entered on record upon the same day, in the order in which they are here mentioned. As to *Metzler's* judgment, the entry on the docket, as to date, was "entered 14th November, 1828," *Leppert's* was "entered 14th November, 1828, at 5 o clock, P. M." *Higernell's* was "entered 14th November, 1828, at 9 o'clock, P. M." The court below was of opinion, that where it appeared by the record, that a judgment was entered at an hour of the day earlier than an other, it was entitled to priority in payment, and decreed accordingly.

*F. Watts* and *Penrose* for appellant.

*Carothers* for appellee.

(Metzler *v.* Kilgore.)

The opinion of the court was delivered by

Gibson, C. J.—A judgment is exclusively a matter of record, and, as such, triable only by itself; insomuch that it can neither be established, falsified, nor explained by inferior evidence.   When the legislature abolished the fiction of date by relation, no change was wrought in this principle, the actual date directed to be written in the margin, being made part of the record by force of the statute. Consistently with a sound construction, then, how far may the legislature be supposed to have gone?    The letter of the enacting clause is satisfied by a specification of the day; and there is no intent apparent in it, to dispense with the common law principle of unity, in respect to the day, as a point of time.    But if the day were susceptible of juridical division, it would be no easy task to determine, in the absence of legislative provision, how the fact of actual priority should be ascertained.    It could not be by the order of the docket, which every one knows to be accidental; and it would be a violation of the common law to resort to parol proof.     There seems to be an irresistable tendency in this species of evidence, to draw to it the exposition of written contracts; but it has not yet seized on our judicial records, and it is our business to guard them against it.   All judgments, whether in vacation or term time, are equally acts of the court; and our jurisprudence would be brought to an alarming pass, if these were to rest, in any respect, in the memory of witnesses.    The date of a judgment is unquestionably a part of it; and it would not only violate a principle of the common law, but be attended with infinite danger to fix the instant of its rendition by parol proof, a recourse to which can be justified only by an overruling necessity; such, for instance, as requires that the contents of a lost record be established by inferior evidence. No such necessity can exist, in a contest for precedence among creditors; and accordingly it seems to be agreed, though the point has not been directly decided by the court in the last resort, that where there is no minute of the precise time of the entry, there can be no division of the day.  1 *Penn. Black.* 418.    It is where there is in fact such a minute that a doubt is entertained, it being supposed that a fractional difference ought to be recognised wherever it *appears by the record*.    But how can it so appear? The precise time cannot be recorded under the authority of the statute, which sanctions nothing that it does not enjoin; for if it were the business of the prothonotary to minute it in a particular case or by request, it would be his business to do so in every case, and it will not be pretended that he would be answerable for having omitted it, as for the neglect of an ordinary duty.   If then, it is neither enjoined or sanctioned by the statute, its legal effect can be no greater than that of any other voluntary act, which happens to be no part of the

(Metzler *v.* Kilgore.)

record. It would be too much, perhaps, to say, that nothing is part of the record here, which would not be so in England; but on the other hand, it is not to be conceded that every thing shall import absolute verity, which may be written in a docket by a prothonotary's clerk. If such a minute were to have the attributes of a record, parol evidence would be inadmissible to disprove or explain it, and if it were conclusive, the power to make it, would, with the best dispositions on the part of the. officer, be liable to great abuse. ·The respective prothonotaries might have no common standard of time, and in the case of a measuring cast, the question of priority between judgments in different courts, would depend on the regularity of their watches. Even as regards judgments in the same courts, it would be dangerous to make an officer the sole and exclusive arbiter of the date. It may be alleged, that the same danger is to be apprehended in regard to the memorandum of the day. But there is comparatively little room for management or mistake where the race is not a close one, in respect to which, alone, fractional differences are important; in fact, where the entries are separated by an interval of twenty-four hours, there is no race at all, and consequently no dispute about periods or dates. It would seem pregnant with inconvenience, and perhaps danger of injustice, so to construe the statute, as to give a minute of the precise time, the effect of record evidence; and short of that, it is not easy to see how it can have effect at all. As a voluntary memorandum, it would be inadmissible on any principle of evidence, further than to refresh the memory of him that made it, preparatory to evidence by him of the fact, for it certainly would not be competent evidence unsustained by his oath; and thus the matter would come to the same thing, as if there had been no memorandum at all, the question depending, in the end, on the recollection of the officer. Thus we should expose the rights of the parties, to the danger of blunder or malpractice in the first instance, and the perils of parol proof in the. second. An argument has been attempted from the practice of endorsing the hour of delivering writs of *fieri facias* to the sheriff, though the statute requires, as in the case of a judgment, no more than the day to be stated. Such a practice doubtless has prevailed, and so uninterruptedly perhaps, as to make the endorsement *prima facie* evidence of the hour. But an execution is not a matter of record, and to permit the memorandum of a fact connected with it, to acquire the consistence of evidence from usage, is a violation of no fundamental principle of the common law. The exact time of delivery may be ascertained, like. any other matter *in pais* by proof, according to the ordinary rules of evidence; as in a contest about the relative priority of delivery and an act bankruptcy. *Selwick P.* 173. The analogy, therefore, does not hold. Extreme cases have been put to show, that injustice

(Metzler v. Kilgore.)

would be done, by refusing to inquire into the fact of actual priority, inasmuch as a lien, perfect at the time of its creation, might otherwise be impaired by the subsequent acts of the debtor; and a loan, obtained on the security of a judgment acknowledged, when it appeared by the records, that the property was not encumbered, is put not merely as a possible but a probable? instance.    We are apt to contemplate rules of property with which we have long been familiar, as essential principles of abstract justice; and such it is usual to consider the lien of a judgment, without reflecting that it is the creature of positive enactment, and that to allow the creditor who first obtains a judgment, a monopoly of the debtor's land, is contrary to a fundamental principle of equity which abhors inequality.    The argument is founded on assumption of the very matter in controversy:—the lender's supposed right to be secure from the interference of subsequent incumbrances, in consequence of knowing that no one had preceded him; for if it be established that fractional parts of the day are to be excluded from the date, the knowledge of the law which every one is bound to have, instead of inducing a false estimate of his position, would induce him to hold the money loaned till the day had gone by.    If, however, a different course were pursued, he could not complain of the consequence as a violation of his right, which is just what the law makes it.    But the fractional principle would be nearly impracticable in its application, and a little more agreeable to our notions of abstract right, than the rule now to be established.    How would it be applied to two judgments, the date of the one being a day certain, and of the other a particular hour of the same day?    If the first were deemed prior, as including the whole day, the party would be rewarded for a want of attention to precision, or gain an advantage perhaps by having purposely omitted to mark the precise time, in order to conceal his own posteriority; and on the other hand, if the second were for these reasons deemed prior, it might happen, that the first would be postponed for a want of precision, not required by any law, and in regard to an act done at a time when the party may have had no reason to anticipate a dispute or the importance of being particular.    In the case of equities so balanced, it seems to me, that justice would dictate a contribution.    Again: take the case of several judgments, all of which but one, contain a a minute of the hour, and a more complicated difficulty will arise. If, as was decreed here, the judgment which contains no minute of the hour, is to share with the first, in the order of specific date, and afterwards, out of what remains, successively in the same way with all the others, it will, by a few operations be fritted away to nothing, and virtually postponed: the other judgments taking the whole, though not according to their specific dates, by which the last might not be reached, but each getting at least something out

(Metzler *v.* Kilgore.)

of the share first set apart for the one without specific date.    If, to avoid that result, the one without specific date is to take a proportion of the *whole fund* in the first instance, and with a view to contribution by all, how is the residue to be applied?    If to the remaining, in the order of their specific dates, the first of them will be paid *in full,* and with obvious injustice to the one which had just before received but a proportion, and which will in turn, however, fare better than the younger ones of specific date, which happen to receive nothing at all.    It might appear, that those which get nothing, ought not to be represented in adjusting the proportions of those that get something.    But they must necessarily be represented in relation to the judgment without specific date, else they are postponed to it, though standing on terms of equality with it; although, if it were out of the way, they might be reached.    If to escape from these difficulties, all the judgments of specific date are paid in proportion, what becomes of the principle of preference, according to actual priority?    A few such examples—and many more might be given—are sufficient to shew, that to do exact justice, on the principle of fractional priority, is impossible.

In contemplation of law, then, these judgments are of equal date: and how are they to be paid?    In *Adams* v. *Dyer,* 8 *Johns.* 268, a preference was given to a creditor whose judgment had no priority, but whose execution was actually begun before any other had been delivered: but the decision is unsupported by the *Attorney General* v. *Andrew, Hardr.* 23, upon which the court relied. That was a contest between a subject and the crown, which claimed a preference by virtue of the royal prerogative; and the point turned on the *Stat.* 33 *Hen.* 8, which of course could not affect a question of preference here.    It may well be, however, that a tenant by *elegit,* shall not be disturbed by a title, whose origin is no earlier than that of his own; but where satisfaction is to be made by the price of the land, instead of the land itself, there is no impediment in the way of exact justice by distribution among the creditors according to their liens.    And however it may be elsewhere, it has never been thought material in *Pennsylvania* to enquire how, or on whose judgment, the money has been made: in fact it sometimes happens, that the seizing creditor gets nothing.    It results, of necessity, then, that creditors whose title is the same, are to have their satisfaction in common; and that such has been the practice, is shewn by *Emerick* v. *Garwood,* 1 *P. A. Brown's Rep.* 20, and *Steele* v. *Taggert, id.* in note.    The rights of purchasers, however, may depend on other considerations; and we, therefore, intimate no opinion in relation to the principle discussed, further than as regards its application to the liens of creditors.

Decree reversed, and distribution ordered *pro rata.*